UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | CHAPTER 13 |
| | : | |
| Gary GRIMM | : | |
| | : | Case No. 17-10625 (MDC) |
| Debtor | : | |

**OBJECTIONS TO CLAIM #2 AGAINST GARY GRIMM BY
THE MONTGOMERY COUNTY TAX CLAIM BUREAU**

1. The objection is to claim numbers 2 in this matter and based on rule 3007(B).

2. Further, this objection can be ruled on based on 11 U.S.C. § 505(a).

3. The foundation for this case commenced March 7, 2000 with a fire in an apartment above Grimm Brothers Realty Company's (hereafter Company) business at 837 Swede Street, (hereafter Swede Street) Norristown.

4. Norristown condemned, and refused to lift the condemnation, of Company's office/ warehouse despite the building being in full compliance with the building codes.

5. This property accounted for 22% of Company's rental income.

6. Besides the loss of rental income, Company had to bear the expense of 2 lawsuits in Montgomery Common Pleas Court At Docket numbers #2000-06356 and #2005-22590 in an attempt to have the Court direct Norristown to issue a Use and Occupancy Permit for Swede Street.

7. Company was forced to defend itself against Norristown in its efforts to sell their properties for sewer bills for the years 1998 to 2004.

8. The sewer bills that exist today have been compounded tenfold despite an agreement made by Norristown to remove the bills if Company agreed not to appeal a court decision in one of the above listed case.

1

9. Company agreed but Norristown reneged on the agreement after the appeal period had expired.

10. A property personally owned by debtor, 337 E. Marshal Street (hereafter Marshall Street.) was managed by Company.

11. The property over the years became seriously underwater and never realized a profit.

12. Debtor never received income from the property and on the other hand never paid any expenses.

13. The Company continues to manage the property today.

14. The Court continued to grant Company equitable relief terms for the repayment of their taxes due to their financial hardship and allowed them to continue with payments terms similar to those they had been granted previously by the Montgomery County Tax Claim Bureau, (Hereafter County) back to 2001.

15. Marshall Street was included as part of the package deal for tax payments throughout the years.

16. Company entered into a new payment agreement with the Bureau in 2010 to pay their delinquent school, county, and local taxes.

17. The agreement was approved by the solicitor for the County at that time; Mr. Douglas Gifford Esquire.

18. This agreement was made under the overview of the Honorable Kenneth Albright, judge for the Montgomery County Court of Common Pleas.

19. Company signed the agreement and returned it to the solicitor.

20. Company made payments per the agreement which continued until November 2016.

21. The solicitor emailed Company that "all was good" with the agreement and his payments.

2

22. Company fulfilled their part of the agreement with the Company, from 2010, making monthly installment payments, which continued until November 2016.

23. Company learned of a pending sale of its properties by the Company for April 30, 2013.

24. Due to the prior election, there was a change in personnel in the County in 2011.

25. Douglas Gifford Esquire was no longer solicitor for the County.

26. Northeast Revenue Services, hereafter Northeast, replaced Portnoff Law Associates (hereafter Portnoff) for collecting the taxes for the County.

27. Portnoff, after losing their contract to Northeast Revenue Service, kept debtor's monthly payments in excess of $10,000 and refused to forward it to Northeast.

28. Company made up this shortfall by doubling their payments to Northeast

29. The new County solicitor claimed to have no knowledge of Company's tax payment agreement and stated there was no record of the agreement filed with the Court.

30. It was indicated to Company by the prior solicitor that he believed the agreement got lost in the courthouse.

31. On February 11, 2015, Company notified Northeast how they wished their monthly tax payments to be distributed.

32. This letter included Marshall Street., Exhibit "A" February 11, 2015 letter.

33. In 2016, Northeast lost their contract with the County and County took over the collecting of their own taxes.

34. In 2016, Debtor was notified that he owed over $10,000.00 in taxes on Marshall Street.

35. Company responded in a letter on March 2, 2016, that Northeast failed to distribute the funds paid to them as directed in their letter of February 11, 2015.

3

36. Company directed the County to apply the next four months payments solely to back taxes for Marshall Street. Exhibit "B" letter to County.

37. This equated to $2735.44 per month.

38. On April 19, 2016, Counties counsel emailed Debtor's bankruptcy attorney, that the County did not recognize an agreement with Company for the payment of their back taxes.

39. The County also stated that Company refused to send only one check per property identifying the parcel.

40. County also stated that the identification of a settlement agreement in the memo section of the Company's check was unacceptable. Exhibit "C" letter from County.

41. Company responded on May 6, 2016 that they were aware that the County did not recognize the agreement that Company had been making payments according to. Company also stated that they were identifying their check payments, in accordance with their agreement with the County and had been doing so for the past decade.

42. The question of an agreement between the Company and County was , and still is, in litigation.

43. Company again reiterated how the payments were to be applied. Exhibit "D", letter to County.

44. In response to another letter from the County in of August 2016, company repeated in their September 2, 2016 letter everything that had been stated in their prior letters.

45. Company also acknowledged the fact that the County was either not cashing or returning their payments. Company included in this letter 2 more check payments for a total of $2,735.44.

46. Company continued making monthly tax payments through October, 2016.

47. In October 2007, 2016, Company sent a letter to the County stating they believed sufficient payments had been made to pay off the monies owed for Marshall Street.

48. Company directed the County that the monies that followed were to be distributed as they had been previous to the dedicated payments for Marshall Street. Exhibit "E", letter to County.

49. Company was unaware of how County was posting their payments.

50. No receipts were being received from the County.

51. Company was unaware of what was owed and for what.

52. Company requested that the Bureau return receipts for payments made indicating how the funds were disbursed. Exhibit "F" letter to County.

53. Previously, the collection agencies hired by the County issued detailed receipts that indicated what payments were applied to what properties, which taxes, interest and fees. Exhibit "G" receipt.

54. With the sales of 2 of Company's properties on October 26, 2016, the County was identified as receiving $47,517.85 according to the distribution papers issued on December 1, 2016.

55. Accordingly, Company believes they were relieved of their obligation to make further payments towards their agreement for back taxes.

56. Despite claims made by the County that the Company/Debtor has not been paying their taxes, the Company/Debtor made timely payments of their 2015, 2016 and 2017 local, county and school taxes. Exhibit "H" tax payment receipts.

5

57. First, in considering the applicability of the Injunction Act (TIA), 28 U.S.C. § 1341. The TIA states in a bankruptcy context, the Third Circuit Court of Appeals has explained: "It is well established, however, that the Tax Injunction Act does not prevent a Bankruptcy Court from enforcing the provisions of the Bankruptcy Code that affect the collection of … taxes." In re Hechinger, 335 F.3d at 247 n.1. More specifically, in considering a dispute involving section 505 of the Bankruptcy Code, Bankruptcy Judge Stephen Raslavich, noted: To the extent that a bankruptcy court must determine a debtor's tax liability in an area where such a determination may otherwise be barred by the Tax Injunction Act, the overwhelming majority view is that Congress expressly conferred jurisdiction on bankruptcy courts to do so in § 505 of the Code. In re Daniels, 304 B.R. 695, 700 (Bankr. E.D. Pa. 2003); see, e.g., In re Pontes, 310 F. Supp. 2d 447, 453 (D.R.I. 2004) ("[W]hile the jurisdictional bar of the TIA is indeed broad, § 505 appears to allow a federal court to exercise jurisdiction if the amount or legality of any tax, fine, or penalty relating to the tax needs to be determined in order to finalize the estate and move the bankruptcy case to closure."). *Additionally see In re ACME Music* Co., 196 B.R. 925, 930 (Bankr. W.D. Pa. 1996) ("The settled law, at least in the Third Circuit, is that a bankruptcy court, pursuant to 28 U.S.C. §§ 1334 and 157, (a) may determine the tax liability of a debtor regardless of the impact (and binding effect) which such determination may also have on non-debtors, but (b) may not determine the tax liability of non-debtors in those instances where such determination would not, in any way, directly and substantially affect the debtor's bankruptcy case.").

58. As such, there is no question this court can here an objection to a tax claim and set the amount actually owed.

59. Additionally, under state law, "'[a] contract is formed when the parties to it 1) reach a mutual understanding, 2) exchange consideration, and 3) delineate the terms of their bargain with sufficient clarity.'" *Forest Glen Condominium Ass'n v. Forest Green Common Ltd. Partnership*, 900 A.2d 859, 863-64 (Pa. Super. 2006) (*quoting Weavertown Transport Leasing, Inc. v. Moran*, 834 A.2d 1169, 1172 (Pa. Super 2003), appeal denied, 578 Pa. 685 (2004)).

60. Under that reading, there is no question in this case, that a contract was formed when Company was making payments, they were accepted, and they did not pursue any further action as those payments were being made.

61. As such, there can also be no question the contract was violated when those payments were no longer accepted.

WHEREFORE, Debtor respectfully request that the court grant their request to dismiss claims equal to the amount of payments made by Company for Marshall Street and not accepted by the County and all associated costs, specifically legal expenses, interest and penalties associated with these payments since January 2016.

*/s/ Gary Grimm*
Gary Grimm

7